**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

GRZEGORZ SKUTNIK,

   Plaintiff,

    v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

   Defendant.

No. 13 CV 7467

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Grzegorz Skutnik filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a motion for summary judgment. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover DIB, a claimant must establish that he or she is disabled within the meaning of the Act.[1] *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that

person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on December 7, 2010, alleging that he became disabled on November 4, 2010, because of back problems. (R. at 41). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 12, 41–44). On May 11, 2012, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 19–40). The ALJ also heard testimony from Linda Gels, a vocational expert (VE) (*id.* at 29–31, 35–36), and Laura Rosch, D.O., a medical expert (ME) (*id.* at 25–29, 37–40, 48).

The ALJ denied Plaintiff's request for benefits on June 7, 2012. (R. at 48–57). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity from November 4, 2010, the alleged onset date. (*Id.* at 50). At step two, the ALJ found that Plaintiff's arthritis of the left knee and status post total left knee replacement are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 50–51).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that he could perform the full range of light work as defined in 20 C.F.R. § 404.1567(b). (R. at 51). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is unable to perform any past relevant work.

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

(*Id.* at 56). At step five, based on Plaintiff's RFC, his vocational factors, and the VE's testimony, the ALJ determined that Plaintiff was "not disabled" under Medical-Vocational Guidelines § 202.18.[3] (*Id.*). Plaintiff met the criteria for dispositive application of § 202.18 because Plaintiff was defined as a younger individual who was capable of the full range of light work, and suffered no nonexertional limitations. (*Id.* at 57). The ALJ noted that even if Plaintiff were limited to sedentary work, a finding of not disabled would be directed by the Grids. (*Id.*) Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the Act. (*Id.*).

The Appeals Council denied Plaintiff's request for review on August 16, 2013. (R. at 1–3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of

---

[3] The Medical Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2 (Grids) are based on vocational factors of age, education, and work experience in combination with each of the possible strength categories of work, i.e. sedentary, light, medium, heavy, and very heavy. Grids § 200.00(a). Where the findings of fact coincide with all of the criteria for one of the rules, the Grids will direct a conclusion as to whether the claimant is or is not disabled. *Id.* The rules are based on administrative notice of the numbers of jobs in the national economy at the various combinations of strength categories and vocational factors. *Id.* § 200.00(b). Where a rule directs a finding of not disabled, the existence of a significant number of jobs in the national economy is presumed for an individual who meets all the combined factors contemplated by the rule. *Id.* Where a given rule directs a finding of disabled, the absence of significant numbers of jobs is presumed. *Id.*

whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

Plaintiff has a history of back problems. He underwent surgery in Poland in 2007. (R. at 26, 186, 242, 277, 302). Plaintiff's symptoms included pain radiating to his extremities and loss of sensation (*id.* at 186–91), and were probably exacerbated by operating a jackhammer for a long period of time in an awkward position (*id.* at 242). These symptoms caused Plaintiff to exhibit an unbalanced gait and muscle weakness, and led Plaintiff to seek various modes of treatment, culminating in a second surgery. (*Id.* at 204–20, 222–25, 228–30, 270–71, 307–08). Plaintiff's impairment prevented him from taking work as a bricklayer, his longtime occupation. (*Id.* at 24, 50).

In January 2010, Plaintiff sought treatment for low back and right leg pain. (R. at 228–30, 247–59). Following referral by Andrzej Indyk, M.D., Plaintiff underwent radiology examination. (*Id.* at 248–57). An MRI revealed moderate degenerative changes at L3-L4, L4-L5, and L5-S1 with myositis ossificans extending from the left transverse process of L2 to the left transverse process of L5. (*Id.* at 250–51, 256–57). Examination showed sizable L4-L5 central disc herniation, mild disc bulging at L3-L4 with minimal bilateral foraminal stenosis and bilateral facet arthropathy, and small disc herniation[4] at L5-S1, with borderline central stenosis and bilateral foraminal stenosis. (*Id.* at 250–51). Plaintiff was referred to a neurologist, Ralph Cabin, M.D.

---

[4] Disc herniation is "extension of disk material beyond the posterior annulus fibrosus and posterior longitudinal ligament and into the spinal canal." *Stedman's Medical Dictionary* 406210 (Nov. 2014). Such extension can compress the spinal nerve root. 1 *Attorneys Medical Deskbook* § 13:20.

On February 24, 2010, Plaintiff was examined by Dr. Cabin, who noted weakness on dorsiflexion, a "very antalgic" gait,[5] a positive straight-leg raise at 40 degrees on the right and 60 degrees on the left, and decreased sensation of cold in the feet, right greater than left. (R. at 242–46). Around this time, Plaintiff complained of pain in the lower back radiating to the gluteal region, and leg pain, up to 6/10, extending to the ankle on the left. (*Id.*). Dr. Cabin recommended analgesics and conservative management including physical therapy. (*Id.* at 244–45). Plaintiff underwent a course of physical therapy comprising at least nine visits.[6] By April 2010, Plaintiff reported no pain, and had returned to work. (*Id.* at 239).

On December 4, 2010, Plaintiff reported low back pain, and began chiropractic treatment with Allen Buresz, D.C. (R. at 204–20, 317). Dr. Buresz opined that conservative treatment would not be effective, and that Plaintiff should schedule surgery. (*Id.* at 317). Treatment from Dr. Buresz included spinal manipulation, massage, homeopathic medicines, and ultrasound. (*Id.*). Plaintiff complained of pain in the back, gluteal region, and legs, (*Id.*), the latter being more severe when sitting, (*Id.* at 206, 207). During this time, starting in Feb 2011, Plaintiff returned to treatment with Dr. Indyk, and was administered epidural blocks.[7] (*Id.* at 222–25). Plain-

---

[5] An antalgic gait is "a characteristic gait resulting from pain on weight-bearing in which the stance phase of gait is shortened on the affected side." <http://www.medilexicon.com/medicaldictionary.php?t=35907>

[6] Plaintiff's physical therapy is not well-documented in the record. (*See* R. at 239–40).

[7] Epidural block is "used inaccurately to refer to epidural anesthesia." *Stedman's Medical Dictionary* 107620 (Nov. 2014).

tiff reported to Dr. Buresz that the injections were 50% effective at reducing his pain. (*Id*. at 204).

On February 18, 2011, Dilip Patel, M.D., examined Plaintiff at the request of the DDS. (R. at 186–191). Dr. Patel noted intact strength and sensation, and a normal gait without need of an assistive device, a positive straight leg raise on the right at 40 degrees, and negative on the left. (*Id*. at 187). Dr. Patel found that Plaintiff was able to heel-toe walk with difficulty, to squat and arise with moderate difficulty, and to get on and off the exam table with difficulty, and observed moderate muscle spasm. (*Id*. at 188). The doctor found a reduced range of motion to 50/90 flexion, 5/25 extension, and 10/25 lateral bending. (*Id*. at 189). The doctor diagnosed lumbosacral degenerative disc disease, a prolapsed disc with radiculopathy symptoms. (*Id*.).

On March 2, 2011, Frank Jimenez, M.D., a DDS consultant, reviewed the medical records and completed an RFC assessment. (R. at 196–203). He concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, and could stand, walk, and sit about 6 hours in an 8-hour workday. (*Id*. at 197). Dr. Jimenez further concluded that Plaintiff could occasionally stoop, kneel, crouch, and crawl. (*Id*. at 198).

In September 2011, Plaintiff was examined by Dr. Indyk and cleared for surgery. (R. at 274).[8] On September 23, 2011, Mark Sokolowski, M.D., an orthopedic sur-

---

[8] The record is silent with respect to Plaintiff's medical records from May 2011 until September 23, 2011.

geon, examined Plaintiff prior to the planned operation. (*Id.* at 297, 301). The doctor observed a "markedly antalgic" gait, a positive sagittal profile,[9] a positive straight leg raise on both sides, weakness in left ankle dorsiflexion, and plantar flexion, along with radiating pain. (*Id.*). Dr. Sokolowski referred Plaintiff for nerve conduction study (NCS) (*id.* at 277–80), MRI (*id.* at 290–91), and pelvic and lumbar spine x-rays (*id.* at 287–89). Dr. Sokolowski noted degenerative disc disease, status post lumbar decompression, L5-S1 disc herniation versus scar tissue, and L4-L5 herniation. (*Id.* at 297, 299–300). The NCS indicated axonal sensorimotor polyneuropathy,[10] and chronic and severe bilateral L5-S1 radiculopathy.[11] (*Id.* at 280). Several days prior to surgery, Plaintiff reported 10/10 pain in his back, buttocks, and legs. (*Id.* at 301). On October 25, 2011, Dr. Sokolowski performed revision lumbar decompression, L5-S1, with bilateral hemiaminectomy, re-exploration of the disc space, partial facetectomy and foraminotomy bilaterally; and revision decompression, L4-L5, with bilateral hemiaminectomy, re-exploration, partial facetectomy and foraminotomy bilaterally (*Id.* at 269).

In a postoperative examination on November 11, 2011, Dr. Sokolowski was optimistic. (R. at 307). He noted negative straight leg raise, symmetrically intact

---

[9] The sagittal plane "divid[es] the body into right and left parts." 1 *Attorneys Medical Deskbook* § 11:5.

[10] Neuropathy generally means disease of the nerves. *Stedman's Medical Dictionary* 60187 (Nov. 2014). Polyneuropathy implicates a number of nerves. *Id.*

[11] Radiculopathy is synonymous with root nerve compression. 2 *Attorneys Medical Deskbook* § 26:8.

strength with respect to quadriceps, dorsiflexors, plantar flexors, and EHL.[12] (*Id.*). Sensation was intact bilaterally. (*Id.*). Plaintiff denied numbness or tingling, and reported that his leg pain had "likely resolved." (*Id.*). Plaintiff was eager to start physical therapy. (*Id.*). In a second postoperative examination on January 11, 2012, Dr. Sokolowski noted that Plaintiff was "decondition[ed]," but recommended ongoing limitations on Plaintiff's activities. (*Id.* at 308). Echoing Plaintiff's self-reported tolerances due to the onset of pain, Dr. Sokolowski opined that Plaintiff should not push, pull, or lift more than 10 to 15 pounds "to minimize [the] risk of recurrence," (*id.*), while "[s]itting and standing are limited to 15-minute increments with a need for break in between." (*Id.*). On February 2, 2012, Plaintiff was seen by Dr. Indyk, who noted that Plaintiff's pain was less severe than before the surgery. (*Id.* at 319).

At the May 11, 2012 hearing, Plaintiff testified that he left his job due to his back problem (R. at 24), and could only walk 30 to 40 feet due to left leg pain and numbness in the toes. (*id.* at 25). Since his surgery, he felt "a little, slightly better." (*Id.* at 33). After experiencing pain, he would take medications, and usually lay down to rest for one to two hours, generally with a frequency of once every three to four hours. (*Id.* at 33–34). The pain prevented him from sitting comfortably for more than an hour (*id.* at 34), or from lifting more than five to eight pounds (*id.* at 34–35). The pain also woke him up "at least two times" during the night. (*Id.* at 34).

---

[12] The extensor hallucis longus (EHL) is a muscle "that functions to extend the big toe, dorsiflex the foot, and assists with foot eversion and inversion." <http://en.wikipedia.org/wiki/Extensor_hallucis_longus_muscle>

The ME testified that Dr. Sokolowski's post-operative examinations did not demonstrate evidence of straight-leg positive pain, atrophy, antalgic gait, use of an assistive device, claudication, foot drop, and focal neurologic deficits. (R. at 27). Nor did Dr. Sokolowski order additional EMGs or consider additional surgeries. (*Id.*). Thus, the ME concluded that Plaintiff's alleged limitations were not supported by the medical record. (*Id.*). The ME opined that prior to surgery, Plaintiff was limited to sedentary work and post-surgery to light work. (*Id.* at 28).

## V. DISCUSSION

Plaintiff raises three arguments in support of his request for a reversal and remand: (1) the ALJ improperly weighed the opinion of Dr. Sokolowski, the Plaintiff's treating physician; (2) the ALJ's credibility determination was patently wrong; and (3) the ALJ's RFC determination was erroneous. (Mot. 1, 7–16). The Court addresses each argument in turn.

## A. Substantial Evidence Supports the ALJ's Determination of the Weight to be Afforded Dr. Sokolowski's Opinion

Treating physician Dr. Sokolowski saw Plaintiff five times, twice both before and after surgery, and once in performing the surgery. (R. at 269–71, 297, 301, 307, 308). The relationship continued from late September 2011 to January 2012. (*Id.*). A few days after the surgery, Dr. Sokolowski opined that Plaintiff would not be able "to return to his prior occupation for at least 12 months." (R. at 306). Following a post-surgery examination, Dr. Sokolowski opined that Plaintiff should not push, pull, or lift more than 10 to 15 pounds "to minimize [the] risk of recurrence," (R. at

308), while "[s]itting and standing are limited to 15-minute increments with a need for break in between." (*Id*.). Dr. Sokolowski recommended these limitations be observed "going forward on [an] ongoing basis in light of the chronicity of [Plaintiff's] symptoms." (*Id*.).

The ALJ gave Dr. Sokolowski's opinion little weight:

> the undersigned agrees that [Plaintiff] is unable to return to his past work as a bricklayer for the reasons discussed below. However, the undersigned gives the remainder of Dr. Sokolowski's opinions little weight, as they are internally inconsistent and are not supported by the weight of the objective medical record. Immediately after [Plaintiff's] surgery, Dr. Sokolowski indicated that [Plaintiff] may be able to return to his past work as a bricklayer, but that it may take twelve or more months for him to do so. This is inconsistent with his later report that [Plaintiff] is limited to sitting and standing in fifteen-minute intervals and that he cannot lift or carry more than ten to fifteen pounds. Dr. Sokolowski's January 2012 statement appears to rely quite heavily on the subject report of symptoms and limitations provided by [Plaintiff], and seems to accept as true most, if not all, of what [Plaintiff] reported. The doctor's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if [Plaintiff] were in fact disabled, and the doctor did not specifically address this weakness.

(R. at 55). Instead, the ALJ afforded "great weight" to the ME's opinion. (*Id*. at 54). Plaintiff argues that the ALJ improperly limited the weight afforded Dr. Sokolowski's opinion. (Mot. 7–8). Plaintiff claims that the ALJ failed to weigh Dr. Sokolowski's opinion using the factors described in *Moss v. Astrue*, 555 F.3d 556 (7th Cir. 2009), and failed to provide a sound explanation for rejecting the doctor's opinion. (*Id*.).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physi-

cian." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted). In determining what weight to give a treating physician's opinion, an ALJ shall "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 561.

After careful review of the record, the Court finds that the ALJ's opinion is supported by substantial evidence, and provides sufficient "detail and clarity." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

### 1. Reliance on Plaintiff's Complaints

To be afforded controlling weight, medical opinions need to be based on tests and observations, and not amount merely to recitation of a claimant's complaints. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Here, Dr. Sokolowski parroted Plaintiff's reported limitations without modification. (*Compare* R. at 308 (Plaintiff reporting that "he can stand for about 15 minutes before he needs to take a break secondary to back pain"; "he can sit for about 15 minutes before he needs to change position"; and "he is unable to lift more than 10 to 15 pounds without significant pain") *with id.* (Dr. Sokolowski concluding that Plaintiff's "[s]itting and standing are limited to 15-minute increments with a need for break in between" and limiting Plaintiff "to pushing, pulling, or lifting no more than 10 to 15 pounds")). Plaintiff posits that Dr. Sokolowski's "opinion was not based on [Plaintiff's] subjective description of his limitations but on Dr. Sokolowski's expertise as an orthopedic surgeon." (Reply 2). But this is mere speculation by Plaintiff—and nothing in the record supports such a conclusion. (*See generally* R. at 297–308). Moreover, Dr. Sokolowski's examination of Plaintiff was unremarkable. A straight leg test was negative bilaterally; strength was symmetrically intact with respect to quadriceps, dorsiflexors, plantar flexors, and EHL bilaterally; sensation was intact to light touch in all dermatomal distributions;[13] and Plaintiff's surgical incision had nicely healed. (*Id.*).

---

[13] "A dermatome is an area of skin that is mainly supplied by a single spinal nerve. There are 8 cervical nerves . . . , 12 thoracic nerves, 5 lumbar nerves and 5 sacral nerves. Each of these nerves relays sensation (including pain) from a particular region of skin to the brain." <http://en.wikipedia.org/wiki/Dermatome_%28anatomy%29> (footnote omitted)

Plaintiff contends that the "ALJ did not identify the clinical manifestations that should have been present to support the restrictions proposed by the doctor." (Mot. 8). But a claimant bears the burden of proof through step four. *Clifford*, 227 F.3d at 868. In any event, the ME reviewed the record and found no evidence of positive straight leg raise, antalgic gait, use of an assistive device, muscle atrophy, claudication, foot drop, or focal neurological deficits. (R. at 27). The ME's conclusions were adopted by the ALJ (*id.* at 54) and rebut Plaintiff's contention.

### 2. *Contradicted by the Medical Evidence*

The ALJ found inconsistency between Dr. Sokolowski's opinions with regard to Plaintiff's ability to return to work a year after the surgery and later-imposed functional limitations. (R. at 55); *see Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (an ALJ may discount a treating physician's opinion as being internally inconsistent). On October 27, 2011, a few days after Plaintiff's surgery, Dr. Sokolowski opined that Plaintiff would not be able "to return to his prior occupation for at least 12 months." (R. at 306). This conclusion was contradicted by Dr. Sokolowski's January 2012 opinion that Plaintiff is limited indefinitely to lifting 10 to 15 pounds.[14] (*Id.* at 308).

Plaintiff contends that Dr. Sokolowski's January 2012 opinion is consistent with his pre-surgery advice that while the surgery would potentially ameliorate Plaintiff's radicular pain, it would have no effect on his back pain. (Mot. 9; *see* R. at 302). But Dr. Sokolowski's pre-surgery advice does not explain the apparent inconsisten-

---

[14] In its undisputed that Plaintiff's previous work as a bricklayer required lifting 30 to 40 pounds. (R. at 31).

cy between his two post-surgery opinions. Plaintiff also argues that just because "the outcome of the surgery did not match the optimistic outcome that Dr. Sokolowski proposed immediately subsequent to the surgery did not render the later opinion of [Plaintiff's] functional capacity any less valid." (Reply 3). Nevertheless, as discussed below, Dr. Sokolowski's opinion is not supported by objective medical evidence.

### 3. Objective Medical Evidence

Dr. Sokolowski's opinion was contradicted by his own examinations. On November 10, 2011, Plaintiff's straight leg test was negative bilaterally; his strength was symmetrically intact with respect to quadriceps, dorsiflexors, plantar flexors, and EHL bilaterally; sensation was intact to light touch in all dermatomal distributions; and Plaintiff's surgical incision was clean, dry and intact. (R. at 307). Dr. Sokolowski's examination yielded similar unremarkable results on January 11, 2012, when he opined that Plaintiff was functionally limited to sitting and standing for no more than 15 minutes and pushing, pulling, or lifting no more than 10 to 15 pounds. (*Id.* at 308). Moreover, Dr. Sokolowski noted that Plaintiff's functional limitations could be due to deconditioning. (*Id.*). Thus, the ALJ's conclusion that Dr. Sokolowski's "own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if [Plaintiff] were in fact disabled" (*id.* at 55) is supported by substantial evidence.

Plaintiff contends that Dr. Sokolowski "had the benefit of reviewing an MRI of [Plaintiff's] lumber spine before issuing his [January 2012] opinion." (Mot. 8). But

the MRI predated Plaintiff's back surgery (*see* R. at 290–91), and thus has no bearing on Dr. Sokolowski's post-surgery opinion. Moreover, Plaintiff reported to both Dr. Sokolowski and Dr. Indyk that his pain had significantly improved post-surgery. (*Id.* at 307, 319). On March 3, 2012, Dr. Indyk reduced Plaintiff's pain medication after he reported that his pain had subsided. (*Id.* at 319; *accord id.* at 52). Similarly, at the hearing, Plaintiff admitted that his pain had lessened since his surgery. (*Id.* at 33). And the ME testified that Plaintiff's post-surgery physical examinations did not show evidence of positive straight leg raise, antalgic gait, use of an assistive device, muscle atrophy, claudication, foot drop, or focal neurological deficits and that no more EMGs or surgeries had been planned. (*Id.* at 27).

### 4. **Moss** *Factors*

Plaintiff contends that the ALJ failed to evaluate Dr. Sokolowski's opinion using the required list of factors (Mot. 7–8), including "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 561; *see* 20 C.F.R. § 404.1527(c). After carefully reviewing the record, the Court concludes otherwise. As discussed above, the ALJ considered the consistency and supportability of Dr. Sokolowski's opinions. The ALJ discussed the medical evidence provided by Dr. Sokolowski in detail, and in so doing recounted the length, nature and extent of that doctor's relationship with Plaintiff, and the frequency of examination thereof. (*See* R. at 54–55). The ALJ mentioned each interaction of Plaintiff with Dr. Sokolowski, noted the result of each visit, and

recounted Dr. Sokolowski's medical opinions. (*Id*.). The ALJ acknowledged the Dr. Sokolowski was a treating source and an orthopedic surgeon. (*Id*. at 54). And the ALJ observed that Dr. Sokolowski's post-surgery examinations were essentially unremarkable. (*Id*. at 53–54).

The ALJ properly weighed the various physicians' opinions, and his decision to give the greatest weight to the ME's opinion was supported by substantial evidence. *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (ALJ determines how much weight to give various medical opinions, which the Court will uphold if supported by substantial evidence.). In sum, the Court finds that the ALJ provided substantial evidence to support his ruling, and the reasons presented were specific enough for the Court to follow. *See Moss*, 555 F.3d at 561.

## B. The ALJ's Credibility Determination Was Not Patently Wrong

On May 11, 2012, approximately six months after his lumber spine surgery, Plaintiff testified that he could only walk 30 to 40 feet due to left leg pain and numbness in the toes. (R. at 25). Plaintiff further alleged that his condition led him to lie down to rest for one to two hours, generally with a frequency of once every three to four hours. (*Id*. at 33–34). He said the pain prevented him from sitting comfortably for more than an hour (*id*. at 34), or from lifting more than five to eight pounds (*id*. at 34–35), and woke him up "at least two times" during the night. (*Id*. at 34). Plaintiff testified that he felt "a little, slightly better" following his surgery. (*Id*. at 33).

In his decision, the ALJ made the following credibility determination:

Despite the[] allegations [of reduced capacity], [Plaintiff] stated that his condition has no effect on his ability to care for his personal needs, which is not what one would expect, given the complaints of disabling symptoms and limitations.

Although [Plaintiff] has received various forms of treatment for the allegedly disabling symptoms, which would normally weigh somewhat in [Plaintiff's] favor, the record also reveals that [Plaintiff's] most recent surgery has been generally successful in controlling those symptoms. . . . [Plaintiff] reported that he received 50% improvement with epidural steroid injections and at the hearing, [Plaintiff] admitted that he has less pain since the surgery and that his medications have been relatively effective in controlling his symptoms. [Plaintiff] has not alleged any side effects from the use of these medications and in March 2012, [Plaintiff's] physician decreased [Plaintiff's] prescription for pain medication because he indicated that his level of pain was less severe than it was prior to the surgery.

Turning to the medical evidence, the objective findings in this case fail to provide strong support for [Plaintiff's] allegations of disabling symptoms and limitations.

*     *     *

On October 25, 2011, [Plaintiff] underwent a revision lumbar decompression at L5-S1 and L4-L5 with bilateral hemilaminectomy, re-exploration of the disc space, and partial facetectomy and foraminotomy bilaterally. Initially, [Plaintiff] stated that he was thrilled with his postoperative progress. He indicated that his lumbar pain improved each day and that his leg pain had resolved, and he denied any numbness or tingling. [Plaintiff's] straight leg raise was negative bilaterally and strength and sensation were symmetrically intact bilaterally.

In January 2012, [Plaintiff] indicated that he had made good postoperative progress but he began to report some residual back and leg pain. Despite [Plaintiff's] subjective reports and allegations that he could only sit and stand for fifteen minutes at a time, physical examinations from that time are essentially normal. [Plaintiff's] straight leg raise testing was again negative bilaterally and strength was intact with respect to this quadriceps, dorsiflexors, plantar flexors, and EHL bilaterally. Sensation was also intact to light touch in all areas and the doctor noted that [Plaintiff's] incision was nicely healed. Although [Plaintiff's] doctor took note of [Plaintiff's] subjective complaints, he also indicated that [Plaintiff's] functional limitations may be due to deconditioning.

(R. at 52–54) (citations omitted).

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling (SSR)[15] 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v.*

---

[15] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administering." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

*Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss*, 555 F.3d at 561. The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

Plaintiff argues that the ALJ erred in discounting Plaintiff's testimony about the nature and extent of his ailments, and claims legal error in the ALJ's development of the record. (Mot. 12–16).

### 1. *Boilerplate Language*

Plaintiff claims that the ALJ relied on boilerplate language and backward reasoning. (*Id*. at 16). The ALJ wrote:

> After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment.

(R. at 54). This is the same language that the Seventh Circuit has repeatedly described as "meaningless boilerplate" because it "yields no clue to what weight the [ALJ] gave the testimony." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). "However, the simple fact that an ALJ used boilerplate language does not automati-

cally undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013). Here, the ALJ pointed to substantial evidence to support his conclusion that Plaintiff's testimony concerning his physical limitations was not reliable.

In finding that the objective evidence did not support the extent of Plaintiff's claimed limitations, the ALJ considered Plaintiff's self-reported ability to care for himself (R. at 52), the success of his surgery (*id.* at 52, 54), the positive effect of medical management of Plaintiff's pain (*id.* at 52), and the results of physical examinations (*id.* at 54). The ALJ weighed this evidence against Plaintiff's testimony. (*See id.* at 52 ("Despite these allegations [of reduced capacity], the [Plaintiff] stated that his condition has no effect on his ability to care for his personal needs, which is not what one would expect, given the complaints of disabling symptoms and limitations."), 54 ("Despite the [Plaintiff's] subjective reports and allegations that he could only sit and stand for fifteen minutes at a time, physical examinations from that time are essentially normal.")). These findings provide ample support for the ALJ's determination. *See Pepper*, 712 F.3d at 367–68.

### 2. *Objective Medical Evidence*

After carefully and thoroughly reviewing the record, the ALJ found that Plaintiff's October 2011 surgery was successful in controlling the worst of Plaintiff's symptoms (R. at 52), and "the objective findings in this case fail to provide strong support for the [Plaintiff's] allegations of disabling symptoms and limitations" (*id.*

at 53). Before being operated on, Plaintiff exhibited a "markedly antalgic" gait, a positive straight leg raise on both sides, weakness in left ankle dorsiflexion and plantar flexion, along with radiating back pain. (*Id.* at 301). Plaintiff's surgery was routine and performed without any complications, as summarized by Dr. Sokolowski. (*Id.* at 303–05). Two weeks later, a physical examination found negative straight leg raise and intact strength and sensation bilaterally. (*Id.* at 307). Plaintiff's surgical incision was clean, dry, and intact. (*Id.*). A physical examination in January 2012 revealed similar, unremarkable results. (*Id.* at 308). And the ME testified that Plaintiff's post-surgery physical examinations did not show evidence of positive straight leg raise, antalgic gait, use of an assistive device, muscle atrophy, claudication, foot drop, or focal neurological deficits and that no more EMGs or surgeries were planned. (*Id.* at 27).

Plaintiff's testimony contradicted his own statements. While Plaintiff reported following surgery that the tingling and numbness had ceased and his leg pain "had likely resolved" (R. at 307), at the hearing he alleged that he could only walk 30 to 40 feet due to left leg pain and numbness in the toes (*id.* at 25). As the Seventh Circuit has noted, Social Security claimants have an incentive to exaggerate their symptoms. *Johnson*, 449 F.3d at 805. Here, Plaintiff's hearing testimony reflected more severe impairments than those he reported to his doctors. Following surgery, Plaintiff reported lessening lumbar pain, absence of leg pain, and lack of numbness or tingling in the extremities to Dr. Sokolowski (*id.*), and that his pain had lessened, to Dr. Indyk. (*Id.* at 319). On March 3, 2012, Dr. Indyk reduced Plaintiff's pain med-

ication after he reported that his pain had subsided. (*Id.* at 319; *accord id.* at 52).
Plaintiff has not reported any side effects from his medications and testified that his
pain had lessened since his surgery. (*Id.* at 33; *accord id.* at 52).

### 3. Plaintiff's Daily Activities

Plaintiff contends that the ALJ improperly assessed his credibility by failing to
consider activities of daily living. (Mot. 12–13; Reply 7–8). On the contrary, the ALJ
explicitly cited Plaintiff's statements that his condition had no effect on his ability
to care for his personal needs. (R. at 52). Indeed, on March 30, 2011, seven months
before his successful back surgery, Plaintiff stated that his impairments had "no ef-
fect" on his ability to care for his personal needs. (*Id.* at 118). Similarly on June 15,
2011, Plaintiff again reported that his impairments had "no effect" on his ability to
care for his personal needs.[16] (*Id.* at 127). And there is no indication in the medical
record that his condition *deteriorated* following his surgery. On the contrary, as dis-
cussed above, the surgery was successful, post-surgery physical examinations were
unremarkable, Plaintiff reported lessening pain, and his pain medication was re-
duced. Indeed, after reviewing the entire medical file, the ME concluded that while
Plaintiff was limited pre-surgery to sedentary work, post-surgery he was capable of
performing light work. (*Id.* at 28). Further, Plaintiff's counsel had the opportunity to
elicit hearing testimony on this issue and chose not to. (*See id.* at 33–35). And even
if Plaintiff had testified to significant reductions in activities of daily living, it would
have been contradicted by the medical record. *See Shinseki v. Sanders*, 556 U.S.

---

[16] In August 2010, Plaintiff reported "no symptoms when doing personal hygiene or driv-
ing car." (R. at 242). His impairments also had no effect on his ability to sleep. (*Id.*).

396, 399–413 (2009) (the party seeking to overturn an agency's administrative decision generally bears burden of demonstrating how any error would have made a difference to his claim); *see also Kreklow ex rel. Kreklow v. Barnhart*, No. 03 C 0574, 2004 WL 2521235, *2 (W.D. Wis. Oct. 22, 2004) (refusing to find that the ALJ failed to sufficiently develop the record in part because "[p]laintiff has not suggested that she could have produced any additional evidence that would have been material to the administrative law judge's decision or that [plaintiff's] mother would have had more relevant information had she only been asked the right questions"); *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993) ("How much evidence to gather is a subject on which district courts must respect the [Commissioner's] reasoned judgment.").

### 4. *Plaintiff's Work History*

Plaintiff also argues that the ALJ was required to consider Plaintiff's long work history in making a credibility determination, citing a few cases in which work history was weighed. (Mot. 14–15; Reply 9–10). However, while an irregular or lackadaisical work history might weigh *against* a Plaintiff's credibility, Plaintiff has not identified and the Court has not found any case or regulation requiring a strong work history to weigh in *favor* of a claimant's credibility. In any event, "the standard of review for credibility determinations is extremely deferential, and the ALJ did provide some evidence supporting [his] determination." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). As discussed above, the Plaintiff's hearing testimony was contradicted by the medical evidence and Plaintiff's previous statements.

In sum, while Plaintiff has demonstrated severe impairments, the ALJ properly concluded that "the objective findings in this case fail to provide strong support for [Plaintiff's] allegations of disabling symptoms and limitations." (R. at 53). The Court concludes that the ALJ's credibility determination was not "patently wrong." *See Craft*, 539 F.3d at 678. The ALJ's credibility finding was supported by substantial evidence and was specific enough for the Court to understand the ALJ's reasoning. *See Moss*, 555 F.3d at 561; *Skinner*, 478 F.3d at 845.

## C. Substantial Evidence Supports the ALJ's Determination that Plaintiff Can Perform the Full Range of Light Work

The ALJ determined that Plaintiff was able to perform the full range of light work. Although the Plaintiff is impaired by an L4-L5 disc herniation with central canal stenosis (R. at 50), the ALJ concluded that the objective medical evidence did not support limitations more restrictive than those permitting the full range of light work. (*Id*. at 51–56).[17]

Plaintiff argues that the ALJ did not explain how this improvement led to the conclusion that Plaintiff was able to perform light work. (Mot. 14). Plaintiff further argues that the ALJ did not determine if the evidence supported Plaintiff's alleged

---

[17] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

need to lie down throughout the day (*id.* 11), and that the ALJ ignored the range of motion limitations recommended by Dr. Patel in a consultative examination (*id.* 14).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft*, 539 F.3d at 676. In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; *see* 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

Plaintiff contends that the ALJ should have included Plaintiff's need to lie down during the day in the RFC. (Mot. 10). However, as discussed above, the ALJ properly discredited Plaintiff's testimony with respect to his claimed functional limita-

tions. Even so, the ALJ did not entirely discount the Plaintiff's testimony. The ALJ noted that Plaintiff "does experience some level of pain and limitations, but only to the extent described in the residual functional capacity above." (R. at 56). The ALJ did not clear Plaintiff to return to his previous work as a bricklayer (*id*. at 55), even though such work was performed by Plaintiff at a medium rather than a heavy level, according to Plaintiff's self-report and the VE's testimony (*id*. at 30–31).

Plaintiff further argues that the ALJ failed to account for the postural limitations recommended by Dr. Patel in a consultative examination. (Mot. 14; *see* R. at 186–91). The Court finds sufficient evidence that the ALJ incorporated these limitations, and that, alternatively, any error was harmless. First, Dr. Jiminez explicitly took Dr. Patel's postural limitations into account and concluded that they did not restrict Plaintiff's ability to perform a full range of light work, which includes occasional stooping. (R. at 196–203); *see* SSR 83-14; 20 C.F.R. § 404.1567(b). The ALJ adopted Dr. Jiminez's opinion regarding light work. (R. at 54).

Second, the Court finds no evidence of postural limitations for any 12-month period. And the record does not support postural limitations following Plaintiff's second surgery. The ME opined, after reviewing Plaintiff's medical record, that Plaintiff would have been limited to sedentary work before his surgery in October 2011, but post-surgery, Plaintiff is capable of work at the light level. (R. at 28). Neither the ME nor Dr. Sokolowski made mention of postural limitations. (*See id*. at 26–28).

Even assuming the ALJ should have explicitly included Dr. Patel's findings in the RFC, the Court finds such error harmless. Sedentary work does not require any

significant bending or stooping. *See* SSR 83-10. But even if plaintiff were limited to sedentary work prior to surgery, as the ME opined, the ALJ noted that the Grids would still mandate a finding of not disabled. (R. at 57). Thus, the Court finds that the ALJ did not err in his assessment of Plaintiff's RFC, and that, alternatively, any such error was harmless.

## V. CONCLUSION

For the reasons stated above Plaintiff's Motion to Reverse the Final Decision of the Acting Commissioner of Social Security [17] is **DENIED**, and Defendant's Motion for Summary Judgment [18] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision is affirmed.

E N T E R:

Dated: January 12, 2015

_____
MARY M. ROWLAND
United States Magistrate Judge